OPINION BY JUDGE JEFFREY P. MINEHART
I. INTRODUCTION
Respondent Magisterial District Judge Michael G. Shaw (Respondent Shaw) has been accused of judicial misconduct by the Judicial Conduct Board in a Complaint filed on November 1, 2016, and by Ian Amended Complaint filed on July 14, 2017. Discovery was completed and then a pretrial conference was held on December 7, 2017.
Subsequently, the parties agreed to Joint Stipulations of Fact in Lieu of Trial and a Waiver of Trial Pursuant to C.J.D.R.P. No. 502(D)(1).
Respondent Shaw's improper conduct spanned the recent adoption of the New Rules Governing Standards of Conduct of Magisterial District Judges. The facts concerning the charges against Respondent Shaw are set forth in the Joint Stipulations of Fact agreed to by the parties, and now, accepted by this Court.
The Joint Stipulations of Fact submitted by the parties which are accepted by this Court are set forth in their entirely as follows:
*352 1. Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania grants to the Board the authority to determine whether there is probable cause to file formal charges against a judicial officer in this Court, and thereafter, to prosecute the case in support of such charges in this Court.
2. From 1994 until the present time, Respondent Shaw has served as Judge of Magisterial District Court 42-3-02.
3. Beginning in or about January or February 2006 until March 2011, and from June 2012 through June or July 2014, Respondent Shaw served as the Presiding Judge of Treatment Court at the Court of Common Pleas of Bradford County.
4. In or about June or July 2014, President Judge Maureen T. Beirne removed Respondent Shaw from his position as Presiding Judge of Treatment Court.
5. Based on Confidential Requests for Investigation at JCB File No. 2014-621 and 2016-643, the Board investigated the instant matters.
6. As a result of its investigation, and pursuant to Article V, § 18(a)(7) of the Constitution of the Commonwealth of Pennsylvania, the Board determined that there is probable cause to file formal charges against Respondent Shaw in this Court.
7. Some of the alleged judicial misconduct occurred prior to December 1, 2014 and therefore, the Old Rules Governing Standards of Conduct of Magisterial District Judges (R.G.S.C.M.D.J.) apply to this Court's determination of whether Respondent Shaw engaged in the alleged misconduct.
8. Some of the alleged judicial misconduct occurred after November 30, 2014 and therefore, the New R.G.S.C.M.D.J. apply to this Court's determination of whether Respondent Shaw engaged in the alleged misconduct.
A. Impropriety: Sexting Conduct
9. For a total of approximately seven years, Respondent Shaw served as the Presiding Judge of Treatment Court for the Court of Common Pleas of Bradford County, Pennsylvania.
10. As the Presiding Judge of Treatment Court, Respondent Shaw was a member of the Treatment Court Committee, which was comprised of five or six other members.
11. During Respondent Shaw's service as Presiding Judge of Treatment Court, the other members of the Treatment Court Committee included an attorney representative from the Bradford County Office of the District Attorney, an attorney representative from the Bradford County Office of the Public Defender, the Assistant Chief Probation Officer and one or more Probation Officers from the Bradford County Probation Department, and a drug and alcohol counselor from Mental Health Associates of Towanda.
12. Each of the participants in Treatment Court had been charged with a DUI or drug related offense in the Court of Common Pleas of Bradford County.
13. When a defendant is charged with a DUI or drug-related offense, a defendant may submit an application to participate in Treatment Court to the Bradford/Sullivan Drug and Alcohol Single County Authority.
14. The Bradford/Sullivan Drug and Alcohol Single County Authority performs an assessment and submits the results to the Treatment Court Committee for tentative approval.
15. If the Treatment Court Committee approves the application and the defendant agrees to the conditions, then the defendant *353 appears in Criminal Court at the Court of Common Pleas for purposes of entering a guilty plea, to be sentenced on the underlying charges and to request placement in the Treatment Court Program.
16. The Sentencing Order for each of the defendants admitted to Treatment Court includes a directive that the defendant must participate in Treatment Court in lieu of or in addition to a term of incarceration or other sentence and comply with all the agreed upon conditions.
17. The Treatment Court Committee reviews the participants' compliance with the rules and conditions of Treatment Court.
18. If a Treatment Court participant fails to abide by the rules and conditions of Treatment Court, then the participant is subject to sanctions.
19. If the appropriate sanction for a Treatment Court participant is a prison term, then the case must be transferred to the Court of Common Pleas.
20. If the appropriate sanction for a Treatment Court participant is a lesser sanction, the Treatment Court Committee meets and decides upon the appropriate sanction. Then the Presiding Judge of Treatment Court is responsible for imposing the sanction during a Treatment Court proceeding.
21. While serving as the Presiding Judge of Treatment Court, Respondent Shaw was the authority figure at Treatment Court who imposed sanctions less than imprisonment, after conferring and reaching consensus with the Treatment Court Committee.
22. As the Presiding Judge of Treatment Court, Respondent Shaw often told the participants, "Honesty is part of the basis for treatment court."
23. On May 30, 2013, J.L. was convicted of a repeat DUI offense in Bradford County.
24. Senior Judge John Leete of Potter County sentenced J.L. to 24 months of intermediate punishment, which consisted of 84 days of incarceration in Bradford County Prison, followed by the remainder of his sentence to be served in Treatment Court.
25. Following completion of his prison term, J.L. became a participant in the Bradford County Treatment Court.
26. As Presiding Judge of Treatment Court, Respondent Shaw and the other members of the Bradford County Treatment Court Committee supervised J.L.'s conduct during the remainder of his sentence.
27. Respondent Shaw has known J.L. for many years. As a young man, Respondent Shaw worked for J.L.'s father and became acquainted with his family.
Sexting Conduct: Girlfriend of Treatment Court Participant
28. In February 2014, Respondent Shaw knew that D.A. was the girlfriend of J.L. J.L. had introduced D.A. to Respondent Shaw at a funeral in January 2013 and D.A. attended Treatment Court as a support person for J.L.
29. In February 2014, D.A. contacted Respondent Shaw through his Facebook page and informed him that she planned to break up with J.L.
30. D.A. believed that J.L. would be upset when she ended their relationship.
31. D.A. expressed concern about J.L.'s potential reaction to her ending their relationship.
*354 32. In response to her Facebook message, Respondent Shaw placed a telephone call to D.A.
33. During their telephone conversation, D.A. voiced her concerns about J.L.'s counseling, court supervision and the possibility that he would relapse because of his history of alcohol dependency.
34. Subsequently, Respondent Shaw sent a text message to D.A. and asked for an update about her plans to end her relationship with J.L.
35. Respondent Shaw continued to send frequent text messages to D.A. from February 2014 through April 2014.
36. Respondent Shaw admits that some of the text messages were very flirtatious.
37. Some of the text messages that Respondent Shaw sent to D.A. were sexual in nature (sexting).
38. The Merriam Webster Dictionary defines "sexting" as "the sending of sexually explicit messages or images by cell phone." www.merriam-webster.com/dictionary.
39. The Urban Dictionary defines "sexting" as "the act of text messaging someone in the hopes of having a sexual encounter with them later; initially casual, transitioning into highly suggestive and even sexually explicit." www.urbandictionary.com.
40. In some of the sext messages sent by Respondent Shaw to D.A., he described the sex acts that he wanted to perform with D.A.
41. In some of the sext messages sent by Respondent Shaw to D.A., he told her that he was fondling himself.
42. In some of the sext messages sent by Respondent Shaw to D.A., he described masturbating alone, masturbating together and his "big cock."
43. Over the course of approximately one month, Respondent Shaw exchanged text and sext messages with D.A. on a frequent basis, at least once a day, sent and received day and night.
44. In the course of the exchange of sext messages, D.A. sent a sexually suggestive photograph of her buttocks.
45. After approximately one month of texting and sexting communications, Respondent Shaw and D.A. agreed to meet in person.
46. In March 2014, on a weekday and during the day, Respondent Shaw and D.A. met at a hotel in Binghamton, NY.
47. D.A. entered the hotel lobby, registered for the room and conducted a cash transaction on behalf of herself and Respondent Shaw.
48. While at the hotel, Respondent Shaw and D.A. engaged in sexual relations and stayed at the hotel for approximately two hours.
49. Following his tryst with D.A., Respondent Shaw's relationship with her gradually faded.
50. By April 2014, Respondent Shaw stopped sending text messages to D.A.
51. In or prior to May 2014, D.A. and J.L. resumed their romantic relationship.
52. In 2014, J.L. and D.A. shared a cell phone account.
53. In February 2014, J.L. reviewed his cell phone bill and noticed text messages and phone calls between D.A. and a phone number with a 607 area code.
54. The calls and texts that J.L. observed on the cell phone bill took place after 10:00 - 11:00 p.m.
55. J.L. called the 607 number and Respondent Shaw's name and phone number appeared in his cell phone directory.
*355 56. J.L. questioned D.A. about why she was calling and texting Respondent Shaw after business hours.
57. D.A. told J.L. that she had contacted Respondent Shaw by cell phone calls and text messages out of concern for J.L.
58. Respondent Shaw drove Treatment Court participant's home from Treatment Court on a regular basis, including J.L.
59. In February 2014, J.L. confronted Respondent Shaw about the phone calls and texts messages between D.A. and Respondent Shaw while Respondent Shaw drove him home following Treatment Court.
60. Respondent Shaw told J.L. that his conversations with D.A., via cell phone calls and text messages, were about J.L.
61. Based on Respondent Shaw's responses and those of D.A., J.L. did not pursue the matter any further at that time.
62. In May 2014, J.L. was holding D.A.'s cell phone while they were shopping together.
63. Respondent Shaw sent a text message to D.A. while J.L. was holding D.A.'s cell phone.
64. Upon seeing the text message from Respondent Shaw to D.A., J.L. became upset.
65. Based on the new text message from Respondent Shaw, J.L. began scrolling through D.A.'s text messages and discovered the prior text messages between Respondent Shaw and D.A., including the sext messages.
66. Upon viewing the sexting history between Respondent Shaw and D.A., J.L. became very upset.
67. J.L. demanded that D.A. delete Respondent Shaw's contact information from her cell phone and notify him to end the relationship.
68. On May 27, 2014, D.A. contacted Respondent Shaw through Facebook and informed him that J.L. discovered the text messages that Respondent Shaw sent to her and was "very upset."
69. In her May 27, 2014 Facebook message, D.A. asked Respondent Shaw, "Please don't text or call me anymore...."
70. On May 27, 2014, Respondent Shaw responded to D.A. via his Facebook page, which displays a photo of him standing in front of a flag.
71. Within his May 27, 2014 Facebook page response, Respondent Shaw agreed not to contact D.A. and apologized to her for his "inappropriate" and "disrespectful" conduct.
72. Within his May 27, 2014 Facebook page response, Respondent Shaw informed D.A. that he would "defriend" her from his Facebook page "so there is no communication possibility."
73. The following week during Treatment Court, Respondent Shaw entered the courtroom wearing his judicial robe and motioned for J.L. and D.A. to come into the jury room with him.
74. While in the jury room, Respondent Shaw apologized to J.L. for his improper conduct toward his girlfriend, D.A.
75. During the meeting in the jury room, J.L. told Respondent Shaw that he was very upset about Respondent Shaw's relationship with D.A.
76. During the meeting in the jury room, Respondent Shaw said to J.L., "I disrespected you."
77. During the meeting in the jury room, Shaw asked D.A. if she wanted to say anything, but J.L. asked Respondent Shaw not to address D.A.
78. J.L. and D.A. returned to the courtroom following their discussion with Respondent Shaw.
*356 79. Back in the courtroom, Respondent Shaw said, "Today I have to eat humble pie."
80. Assistant Chief Probation Officer Susan Ide was present in the courtroom and believed that Respondent Shaw's statement about humble pie was somehow related to J.L. and D.A.
81. J.L. did not request that Respondent Shaw recuse from his role as Presiding Judge of Treatment Court.
82. Respondent Shaw did not offer to recuse from his role as Presiding Judge of Treatment Court.
83. Respondent Shaw then proceeded with his duties as Presiding Judge of Treatment Court with J.L. and D.A. remaining in the courtroom with the other participants and the Treatment Court Committee.
84. The following Sunday, Respondent Shaw either texted or called J.L. to ask if they could meet.
85. Respondent Shaw drove his vehicle to J.L.'s home and asked him to go for a ride.
86. J.L. complied and rode with Respondent Shaw in his vehicle for about 10 minutes while they talked about Respondent Shaw's relationship with D.A.
87. During their conversation in the vehicle, Respondent Shaw spoke about resigning from his position as Presiding Judge of Treatment Court.
88. J.L. recalled that during their conversation, Respondent Shaw advised J.L. that if he resigned, then Treatment Court would likely cease to exist.
89. J.L. did not want to see Treatment Court fail because of his personal issues with Respondent Shaw.
90. As a Level II Treatment Court participant, J.L. was required to attend Treatment Court every two weeks. Therefore, he was not required to and did not attend Treatment Court the week after Respondent Shaw apologized to and D.A. about his improper conduct.
91. Respondent Shaw chose to continue as Presiding Judge of Treatment Court, even after the Treatment Court session when he made the statement about "eat[ing] humble pie."
92. Respondent Shaw wanted to preside over a graduation ceremony for some of the Treatment Court participants, which was scheduled two weeks after the Treatment Court session when he made the statement about "eat[ing] humble pie."
93. J.L. was concerned about how Respondent Shaw's relationship with D.A. might impact his standing in Treatment Court and his supervision by the Treatment Court Committee.
94. After J.L. discovered the text and sext messages on D.A.'s cell phone, he discussed the situation with his drug and alcohol counselor.
95. Another Treatment Court participant, T.J., knew of Respondent Shaw's text and sext messages to D.A. and reported the information to Probation Officer Craig Duddy.
96. Probation Officer Duddy reported what he had learned from T.J. to Assistant Chief Probation Officer Ide.
97. In or about June or July 2014, Assistant Chief Probation Officer Ide reported the information about Respondent Shaw's alleged conduct to President Judge Maureen T. Beirne.
98. President Judge Beirne, Probation Officer Duddy, and Assistant Chief Probation Officer Ide met with Respondent Shaw for approximately 20 minutes and confronted him about the "inappropriate texting" with D.A.
*357 99. During the meeting in President Judge Beirne's chambers, Respondent Shaw admitted that he sent and received sexually explicit texts to and from D.A.
100. During the meeting in President Judge Beirne's chambers, Respondent Shaw denied that he was having an affair with D.A.
101. As a result of Respondent Shaw's improper conduct toward D.A., President Judge Beirne informed Respondent Shaw she was removing him immediately from his position as Presiding Judge of Treatment Court.
102. The timing of his removal as Presiding Judge of Treatment Court preceded the graduation ceremony that Respondent Shaw had hoped to attend.
103. Treatment Court participants learned of the sexting conduct and were upset that Respondent Shaw, who had repeatedly preached to them about honesty, had "hurt one of their own behind their backs."
104. Treatment Court participants regarded Respondent Shaw as "their judge. He motivated them, acted like he cared and when this matter occurred they thought it was disturbing. Some lost their enthusiasm."
105. J.L. was not aware that Respondent Shaw engaged in sexual relations with D.A.
106. Prior to the Board's investigation of the instant matter, President Judge Beirne was not aware that Respondent Shaw engaged in sexual relations with D.A.
Sexting Conduct: Probation Officer
107. At his July 30, 2015 deposition, Respondent Shaw admitted that he engaged in sexting conduct with other women.
108. In response to the Second Supplemental Notice of Full Investigation, Respondent Shaw identified R.K as one of the women to whom he sent sext messages.
109. R.K. is a 35-year-old woman who worked as Bradford County Adult Probation Department in 2012-2013. Her position with the Adult Probation Department coincided with part of Respondent Shaw's term of service as a magisterial district judge in Bradford County.
110. During her employment as a Bradford County Probation Officer, R.K. interacted with Respondent Shaw on an almost daily basis, typically via telephone communication, about Treatment Court business.
111. Respondent Shaw and R.K. have known each other for approximately 13 years and are personal friends.
112. R.K. visited Respondent Shaw at his home on several occasions while other people were present.
113. In or about 2012-2013, R.K. served on the Treatment Court Committee for the Court of Common Pleas of Bradford County while Respondent Shaw was the Presiding Judge of Treatment Court.
114. In or about 2012, while Respondent Shaw and R.K. served as members of the Treatment Court Committee, Respondent Shaw began to use his personal cell phone to send text and sext messages to R.K.
115. R.K. described the text and sext messages that she received from Respondent Shaw as flirtatious.
116. R.K. was "shocked by the text messages from Respondent Shaw but went along with them."
117. R.K. did not tell Respondent Shaw to stop sending the text and sext messages to her.
*358 118. Respondent Shaw and R.K. exchanged sext messages from 2012 through 2013.
119. In 2013, R.K. changed jobs to work for Bradford County Court Administration.
120. When R.K. ceased working for Adult Probation and serving on the Treatment Court Committee, R.K and Respondent Shaw no longer communicated with one another on a frequent basis.
121. In or about 2013, Respondent Shaw gradually stopped exchanging text and sext messages with R.K.
122. At his May 19, 2016 deposition, Respondent Shaw denied any recollection of the exact language contained within his sext messages to R.K. However, he recalled the terms "nooner" and "having ice cream" when describing suggestive, flirtatious, sexual language that was commonly bantered among his group of peers at the time that he engaged in the sexting conduct.
123. R.K. described the text message exchanges with Respondent Shaw as "so stupid and wrong."
B. Ex Parte Communications
Note: To facilitate consistency with the Board Complaint and the Answer to Complaint, the Amended Board Complaint and the Answer to the First Amended Complaint, the stipulated facts are repeated in Section B, Ex Parte Communications, and Section C, Special Consideration. The same set of facts is integral to the charges as set forth in the Amended Board Complaint. The following paragraphs correspond to one another:
*359 Ex Parte Special Consideration 124 172 125 173 126 174 127 175 128 176 129 177 130 178 131 179 132 180 133 181 134 182 135 183 136 184 137 185 138 186 139 187 140 188 141 189 142 190 143 191 144 192 145 193 146 194 147 195 148 196 149 197 150 198 151 199 152 200 153 201 154 202 155 203 156 204 157 205 158 206 159 207 160 208 161 209 162 210 163 211 164 212 165 213 166 214
Treatment Court Participants
124. The Treatment Court policy in effect when Respondent Shaw served as Presiding Judge provided that if a Treatment Court participant had an urgent matter arise between Treatment Court sessions, such as a missed appointment or missed urine test, then the participant was directed to call the Probation Department *360 and speak with the on-call Probation Officer.
125. According to the Treatment Court policy, as Presiding Judge of Treatment Court, Respondent Shaw was not a designated contact person for participants who had urgent matters arise between Treatment Court sessions.
126. Some participants disregarded the Treatment Court reporting policy and contacted Respondent Shaw directly when urgent matters arose between Treatment Court sessions.
127. Respondent Shaw accepted and responded to telephone calls and text messages from Treatment Court participants about urgent matters, despite the Treatment Court Policy directing the participants to call the Probation Department.
128. Respondent Shaw admitted he offered advice and encouragement to the Treatment Court participants who called or texted him and those who approached him in public places.
129. Other members of the Treatment Court Committee were dissatisfied that Respondent Shaw permitted Treatment Court participants to communicate directly with him by telephone calls and text messages, in disregard of the Treatment Court policy directing participants to report urgent matters that arose between Treatment Court sessions to the Probation Department.
Litigants and Relatives of Litigants
130. In the cases set forth below, Respondent Shaw sent text messages to, and received text messages from, litigants and relatives of litigants who were scheduled to appear before him in his magisterial district court.
Ex Parte Communications from and Response to Employer of Litigant
131. On December 31, 2014, Pennsylvania State Police-Towanda issued a Summary Traffic Citation to A.F. for Failure to Obey the Instructions of an Applicable Official Traffic-Control Device (exceeding the speed limit). The Traffic Citation was e-filed in Respondent Shaw's district court that same day. Commonwealth v. Field, Docket No. MJ-42302-TR-0001645-2014.
132. On January 6, 2015, A.F. filed a Not Guilty Plea to the summary traffic charge and requested a summary trial. In her typewritten plea, dated January 5, 2015, A.F. wrote, "I can't forward the collateral at this time. I haven't got the extra funds at this time to cover the amount."
133. A.F.'s Summary Traffic Trial was scheduled for February 2, 2015 at 9 a.m. in Respondent Shaw's district court.
134. L.H. is the wife of a police officer who is employed by the Sayre Borough, PA Police Department.
135. On February 2, 2015 at 5:11:12 p.m., L.H. sent a text message to Respondent Shaw's personal cell phone in which she stated that she had mistakenly advised her employee, A.F., that her hearing scheduled before Respondent Shaw was cancelled.
136. On February 2, 2015 at 5:32:30 p.m., Respondent Shaw responded by text message to L.H. and said, "K have her call tomm."
137. On February 2, 2015 at 5:54:26 p.m., L.H. further explained in her reply text message to Respondent Shaw: "The ticket is a financial hardship for her [employee], so Jeremy told her to take the hearing and ask for a lesser fine. Thanks judge."
*361 138. Earlier on February 2, 2015 at or about 9:00 a.m., Respondent Shaw presided over the summary traffic trial in Commonwealth v. Field, the case referenced by L.H. in her text message to Respondent Shaw.
139. On February 2, 2015, the charge against A.F. was changed from Obedience to Traffic-Control Device to a new charge of Exceed 55 mph by 5 mph.
140. On February 2, 2015, Respondent Shaw adjudicated A. F. "Guilty in absentia" and sentenced her to fines and costs.
Ex Parte Communications to and from Relative of Litigant
141. In his role as magisterial district judge, Respondent Shaw went to local schools and presided over school truancy cases.
142. Respondent Shaw does not have a written policy concerning management of truancy cases that are filed in his district court.
143. Respondent Shaw worked with A.W. to try to keep her on track with attendance and her behavior at school.
144. A.W., a student at a local high school, had a record of multiple unlawful absences from school.
145. On January 23, 2015, a Truancy Elimination Plan was implemented by the high school principal, which provided that if A.W. missed one more day of school without a doctor's note, then a citation would be filed in Respondent Shaw's district court.
146 On March 26, 2015, Sayre Borough filed a Private Criminal Complaint against A.W.'s mother in Respondent Shaw's district court and alleged that A.W. was illegally absent from school on 11 days following the implementation of the January 23, 2015 Truancy Elimination Plan. Docket No. MJ-42302-NT-0000095-2015.
147. On March 26, 2015, Respondent Shaw's district court issued a summons to A.W.'s mother.
148. On March 27, 2015, Respondent Shaw sent a text message from his personal cell phone to A.W. and made the following request:
[A.W.] It's Respondent Shaw could you please call me. It's very important about your future.
149. On April 8, 2015, A.W. and Respondent Shaw exchanged text messages via Respondent Shaw's personal cell phone as follows:
A.W.: Is there any way I could make an appointment to talk to you sometime this week?
Respondent Shaw: Yes, when would you like to do it you let me know.
A.W.: Is tomorrow okay?
Respondent Shaw: Yes, what time?
A.W.: Would you be able to come into school and talk to me. I have study hall from 11:14 to 11:56. And then I have the star tutoring after school until 5.
Respondent Shaw: Yes I will.
A.W.: Okay, see you then. Have a good night.
Respondent Shaw: Ty u too.
150. On June 11, 2015, a Summary Trial was scheduled in the truancy case filed against A.W.'s mother.
151. On June 11, 2015, Respondent Shaw dismissed the truancy case against A.W.'s mother.
Ex Parte Communications from and Responses to Relative of Litigant
152. As magisterial district judge, Respondent Shaw volunteered to preside over Juvenile Accountability Court, an informal entity.
*362 153. Through his volunteer work at the Juvenile Accountability Court, Respondent Shaw became well acquainted with W.F. and his sister, V.F., who was a student at the local high school.
154. As a magisterial district judge who volunteered at the Juvenile Accountability Court, Respondent Shaw presided over cases involving W.F.'s sister, V.F.
155. On April 20, 2014, W.F. sent a text message to Respondent Shaw's personal cell phone pertaining to a citation he received for a summary motor vehicle violation in another district.
156. Respondent Shaw had seen W.F. in the community prior to the text message and had agreed to look up an answer to W.F.'s question about his traffic citation.
157. On April 20, 2014, Respondent Shaw responded by text message to W.F. and stated:
Call 570-265-9393 ask them when your hearing is when they say you don't have one say I Plead not Guilty.
158. W.F. replied by text message, "Ok will do."
159. At his May 19, 2016 Board deposition, Respondent Shaw stated that he was explaining procedure to W.F.
160. On December 1, 2014, Athens Township Police Department issued a Non-Traffic Citation to W.F.'s sister, V.F., charging her with the summary offense of Retail Theft. Docket No. MJ-42302-NT-0000413-2014. The case was filed in Respondent Shaw's district court.
161. On February 24, 2015, the summary charge of Retail Theft against V.F. was withdrawn.
162. On March 11, 2015, Athens Township Police refiled charges against V.F. consisting of two misdemeanor-2 charges: Retail Theft - Take Merchandise; and Receiving Stolen Property. Docket No. MJ-42302-CR-0000091-2015.
163. On April 21, 2015 at 10:00:06 a.m., W.F. sent a text message to Respondent Shaw about his sister, V.F., who was scheduled to appear before Respondent Shaw in his district court that same day.
I was gonna say something to you when I seen you but forgot to. Like to give little recommendation to you for my sister [V.F.] She's in your court today. She has don't [sic] a complete 360 and has changed her life for the better and has a son that she takes extremely good care of and she has now gotten her own place and is constantly work[ing] her better of [sic] to be a great mom and a good person. So if you could just take this in consideration for me I'd appreciate if very must [sic]. Hopefully you get this before she goes in front of you. Thank you.
164. On April 21, 2015 at 10:00:51 a.m., Respondent Shaw responded to W.F. by text message from his personal cell phone and stated, "Ok will np [no problem] Ty [Thank you]."
165. On April 21, 2015, Respondent Shaw presided over V.F.'s Preliminary Hearing scheduled for 10:00 a.m., wherein V.F. waived the two misdemeanor charges for court.
166. At his May 19, 2016 Board deposition, Respondent Shaw explained that although he presided over the case involving V.F., the summary charge was withdrawn, refiled as misdemeanors and V.F. waived the charge for court.
C. Special Consideration
167. Respondent Shaw presided over Treatment Court and participated as a member of the Treatment Court Committee on a weekly basis.
*363 168. Many of the Treatment Court participants were not legally permitted to drive vehicles because their driver's licenses were suspended because of DUI convictions.
169. Some Treatment Court participants, including J.L., would stand and wait by Respondent Shaw's car after Treatment Court ended in hopes of getting a ride home from Respondent Shaw.
170. Following Treatment Court, Respondent Shaw drove many of the participants to their homes, including J.L.
171. Respondent Shaw provided transportation to the Treatment Court participants in order to "make it easier for them."
172. The Treatment Court policy in effect when Respondent Shaw served as Presiding Judge provided that if a Treatment Court participant had an urgent matter arise between Treatment Court sessions, such as a missed appointment or missed urine test, then the participant was directed to call the Probation Department and speak with the on-call Probation Officer.
173. According to the Treatment Court Policy, as Presiding Judge of Treatment Court, Respondent Shaw was not a designated contact person for participants who had urgent matters arise between Treatment Court sessions.
174. Some participants disregarded the Treatment Court reporting policy and contacted Respondent Shaw directly when urgent matters arose between Treatment Court sessions.
175. Respondent Shaw accepted and responded to telephone calls and text messages from Treatment Court participants about urgent matters, despite the Treatment Court Policy directing the participants to call the Probation Department.
176. Respondent Shaw admitted that he offered advice and encouragement to the participants who called or texted him and to those who approached him in public places.
177. Other members of the Treatment Court Committee were dissatisfied that Respondent Shaw permitted Treatment Court participants to communicate directly with him by telephone calls and text messages, in disregard of the Treatment Court policy directing participants to report urgent matters that arose between Treatment Court sessions to the Probation Department.
Litigants and Relatives of Litigants
178. In the cases set forth below, Respondent Shaw sent text messages to, and received text messages from, litigants and relatives of litigants who were scheduled to appear before him in his magisterial district court.
Ex Parte Communications from and Response to Employer of Litigant
179. On December 31, 2014, Pennsylvania State Police-Towanda issued a Summary Traffic Citation to A.F. for Failure to Obey the Instructions of an Applicable Official Traffic-Control Device (exceeding the speed limit). The Traffic Citation was e-filed in Respondent Shaw's district court that same day. Commonwealth v. Field, Docket No. MJ-42302-TR-0001645-2014.
180. On January 6, 2015, A.F. filed a Not Guilty Plea to the summary traffic charge and requested a summary trial. In her typewritten plea, dated January 5, 2015, A.F. wrote, "I can't forward the collateral at this time. I haven't got the extra funds at this time to cover the amount."
181. A.F.'s Summary Traffic Trial was scheduled for February 2, 2015 at 9:00 a.m. in Respondent Shaw's district court.
*364 182. L.H. is the wife of a police officer who is employed by the Sayre Borough, PA Police Department.
183. On February 2, 2015 at 5:11:12 p.m., L.H. sent a text message to Respondent Shaw's personal cell phone in which she stated that she had mistakenly advised her employee, A.F., that her hearing scheduled before Respondent Shaw was cancelled.
184. On February 2, 2015 at 5:32:30 p.m., Respondent Shaw responded by text message to L.H. and said, "K have her call tomm."
185. On February 2, 2015 at 5:54:26 p.m., L.H. further explained in her reply text message to Respondent Shaw: "The ticket is a financial hardship for her [employee], so Jeremy told her to take the hearing and ask for a lesser fine. Thanks judge."
186. Earlier on February 2, 2015 at or about 9:00 a.m., Respondent Shaw presided over the summary traffic trial in Commonwealth v. Field, the case referenced by L.H. in her text message to Respondent Shaw.
187. On February 2, 2015, the charge against A.F. was changed from Obedience to Traffic-Control Device to a new charge of Exceed 55 mph by 5 mph.
188. On February 2, 2015, Respondent Shaw adjudicated A. F. "Guilty in absentia" and sentenced her to fines and costs.
Ex Parte Communications to and from Relative of Litigant
189. In his role as magisterial district judge, Respondent Shaw went to local schools and presided over school truancy cases.
190. Respondent Shaw does not have a written policy concerning management of truancy cases that are filed in his district court.
191. Respondent Shaw worked with A.W. to try to keep her on track with attendance and her behavior at school.
192. A.W., a student at a local high school, had a record of multiple unlawful absences from school.
193. On January 23, 2015, a Truancy Elimination Plan was implemented by the high school principal, which provided that if A.W. missed one more day of school without a doctor's note, then a citation would be filed in Respondent Shaw's district court.
194. On March 26, 2015, Sayre Borough filed a Private Criminal Complaint against A.W.'s mother in Respondent Shaw's district court and alleged that A.W. was illegally absent from school on 11 days following the implementation of the January 23, 2015 Truancy Elimination Plan. Docket No. MJ-42302-NT-0000095-2015.
195. On March 26, 2015, Respondent Shaw's district court issued a summons to A.W.'s mother.
196. On March 27, 2015, Respondent Shaw sent a text message from his personal cell phone to A.W. and made the following request:
[A.W.] It's Respondent Shaw could you please call me. It's very important about your future.
197. On April 8, 2015, A.W. and Respondent Shaw exchanged text messages via Respondent Shaw's personal cell phone as follows:
A.W.: Is there any way I could make an appointment to talk to you sometime this week?
Respondent Shaw: Yes, when would you like to do it you let know.
A.W.: Is tomorrow okay?
Respondent Shaw: Yes, what time?
*365 A.W.: Would you be able to come into school and talk to me. I have study hall from 11:14 to 11:56. And then I have the star tutoring after school until 5.
Respondent Shaw: Yes I will.
A.W.: Okay, see you then. Have a good night.
Respondent Shaw: Ty u too.
198. On June 11, 2015, a Summary Trial was scheduled in the truancy case filed against A.W.'s mother.
199. On June 11, 2015, Respondent Shaw dismissed the truancy case against A.W.'s mother.
Ex Parte Communications from and Responses to Relative of Litigant
200. As magisterial district judge, Respondent Shaw volunteered to preside over Juvenile Accountability Court, an informal entity.
201. Through his volunteer work at the Juvenile Accountability Court, Respondent Shaw became well acquainted with W.F. and his sister, V.F., who was a student at the local high school.
202. As a magisterial district judge who volunteered at the Juvenile Accountability Court, Respondent Shaw presided over cases involving W.F.'s sister, V.F.
203. On April 20, 2014, W.F. sent a text message to Respondent Shaw's personal cell phone pertaining to a citation he received for a summary motor vehicle violation in another district.
204. Respondent Shaw had seen W.F. in the community prior to the text message and had agreed to look up an answer to W.F.'s question about his traffic citation.
205. On April 20, 2014, Respondent Shaw responded by text message to W.F. and stated:
Call 570-265-9393 ask them when your hearing is when they say you don't have one say I Plead not Guilty.
206. W.F. replied by text message, "Ok will do."
207. At his May 19, 2016 Board deposition, Respondent Shaw stated that he was explaining procedure to W.F.
208. On December 1, 2014, Athens Township Police Department issued a Non-Traffic Citation to W.F.'s sister, V.F., charging her with the summary offense of Retail Theft. Docket No. MJ-42302-NT-0000413-2014. The case was filed in Respondent Shaw's district court.
209. On February 24, 2015, the summary charge of Retail Theft against V.F. was withdrawn.
210. On March 11, 2015, Athens Township Police refiled charges against V.F. consisting of two misdemeanor-2 charges: Retail Theft - Take Merchandise; and Receiving Stolen Property. Docket No. MJ-42302-CR-0000091-2015.
211. On April 21, 2015, at 10:00:06 a.m., W.F. sent a text message to Respondent Shaw about his sister, V.F., who was scheduled to appear before Respondent Shaw in his district court that same day.
I was gonna say something to you when I seen you but forgot to. Like to give little recommendation to you for my sister [V.F.] She's in your court today. She has don't [sic] a complete 360 and has changed her life for the better and has a son that she takes extremely good care of and she has now gotten her own place and is constantly work[ing] her better of [sic] to be a great mom and a good person. So if you could just take this in consideration for me I'd appreciate if very must [sic]. Hopefully you get this before she goes in front of you. Thank you.
*366 212. On April 21, 2015 at 10:00:51 a.m., Respondent Shaw responded to W.F. by text message from his personal cell phone and stated, "Ok will np [no problem] Ty [Thank you]."
213. On April 21, 2015, Respondent Shaw presided over V.F.'s Preliminary Hearing scheduled for 10:00 a.m., wherein V.F. waived the two misdemeanor charges for court.
214. At his May 19, 2016 Board deposition, Respondent Shaw explained that although he presided over the case involving V.F., the summary charge was withdrawn, refiled as misdemeanors and V.F. waived the charge for court.
D. Additional Facts Pursuant to 3CB File No. 2016-643
215. On June 1, 2015, the Board issued a Notice of Full Investigation to Respondent Shaw at JOB File No. 2014-621.
216. On June 29, 2015, Attorney Rinaldo DePaola entered his appearance as Respondent Shaw's attorney in the Board's investigation at 2014-621.
217. Mr. DePaola continued to represent Respondent Shaw throughout the Board's investigation at 2014-621.
218. On November 1, 2016, the Board filed a Board Complaint against Respondent Shaw in the Court of Judicial Discipline (CJD). In re Shaw, 5 JD 2016.
219. On November 4, 2016, the Board initiated a Confidential Request for Investigation at JCB File No. 2016-643 pertaining to Respondent Shaw's conduct in a Landlord/Tenant matter, Hutchison v. Reeves, Docket No. MJ-42302-LT-0000054-2016.
220. On December 6, 2016, Mr. DePaola filed the Answer to the Board Complaint, in the CJD. In re Shaw, Docket No. 5 JD 2016.
221. On December 16, 2016, Mr. DePaola entered his appearance in the CJD in In re Shaw, 5 JD 2016.
Hutchison v. Reeves
222. On September 9, 2016, Respondent Shaw presided over a Landlord/Tenant Hearing wherein William A. Shaw, Esquire, represented the landlord, Robin M. Hutchison, and Rinaldo DePaola, Esquire, represented the tenants. Hutchison v. Reeves, Docket No. MJ-42302-LT-0000054-2016.
223. On September 9, 2016, the Board had not yet filed the Board Complaint against Respondent Shaw and therefore the charged conduct was not public knowledge.
224. Robin M. Hutchison, Esquire, is a practicing attorney in Bradford County.
225. At the September 9, 2016 Landlord/Tenant Hearing, Respondent Shaw did not disclose to Mr. Hutchison or Attorney William Shaw that Mr. DePaola represented him in a pending judicial disciplinary matter.
226. At the September 9, 2016 Landlord/Tenant Hearing, the parties, through their attorneys, reached a verbal agreement such that the tenants would be evicted.
227. On September 9, 2016, Respondent Shaw entered judgment for the landlord and against the tenants in the amount of $1941.11 and granted possession of the real property if the money judgment was not satisfied by the time of eviction.
228. In November 2016, Mr. Hutchison first learned that Mr. DePaola represented Respondent Shaw in a judicial disciplinary matter when he read a newspaper article about the Board Complaint, In re Shaw, Docket No. 5 JD 2016.
*367 Other Civil Matters Filed in District Court 43-3-02
229. Between July 1, 2015 and October 27, 2016, Mr. DePaola filed the following 42 cases in Respondent Shaw's district court:
Case Docket No. Date Filed Guthrie Clinic Ltd. v. Prough CV-0000120-2015 July 10, 2015 Guthrie Clinic Ltd. v. Polzella, et al. CV-0000126-2015 July 20, 2015 St. Joseph's Hospital v. Westerfer CV-0000135-2015 August 7, 2015 Arnot Medical Services v. Westerfer CV-0000136-2015 August 7, 2015 Arndt Medical Services v. Westerfer CV-0000140-2015 August 7, 2015 St. Joseph's Hospital v. Westerfer CV-0000141-2015 August 7, 2015 Arnot Ogden Medical Center v. Whipple CV-0000131-2015 August 7, 2015 Robert Packer Hospital v. Loomis CV-0000146-2015 September 4, 2015 Robert Packer Hospital v. Reynolds CV-0000148-2015 September 8, 2015 Corning Hospital v. Ling CV-0000180-2015 October 29, 2015 Robert Packer Hospital v. Wendell CV-0000181-2015 October 29, 2015 Robert Packer Hospital v. Morley, et al CV-0000182-2015 October 29, 2015 Robert Packer Hospital v. Schmoyer, et al CV-0000183-2015 November 2, 2015 Robert Packer Hospital v. Weingartner CV-0000184-2015 November 2, 2015 Robert Packer Hospital v. Loomis CV-0000190-2015 November 24, 2015 Robert Packer Hospital v. Page CV-0000191-2015 November 24, 2015 Robert Packer Hospital v. Pardoe, et al CV-0000202-2015 December 14, 2015 Guthrie Clinic LTD v. Lee, et al CV-0000203-2015 December 14, 2015 Robert Packer Hospital v. Lee, et al CV-0000204-2015 December 14, 2015 Guthrie Clinic Ltd v. Shadduck CV-0000208-2015 December 17, 2015 Guthrie Clinic Ltd v. Roach, et al CV-0000209-2015 December 17, 2015 Robert Packer Hospital v. Moore, et al CV-0000001-2016 January 13, 2016 Robert Packer Hospital v. Robbins CV-0000004-2016 January 25, 2016 *368 Robert Packer Hospital v. Lattimer CV-0000016-2016 February 12, 2016 Robert Packer Hospital v. Townsand, et al CV-0000045-2016 April 4, 2016 Robert Packer Hospital v. Weinman CV-0000046-2016 April 4, 2016 Guthrie Clinic Ltd v. Moore, et al CV-0000050-2016 April 20, 2016 Robert Packer Hospital v. Saxon, et al CV-0000053-2016 April 25, 2016 Robert Packer Hospital v. Lowell, et al CV-0000054-2016 April 25, 2016 Robert Packer Hospital v. Loskie, et al CV-0000055-2016 April 25, 2016 Robert Packer Hospital v. Orozco, et al CV-0000063-2016 May 23, 2016 Guthrie Clinic Ltd v. Walt, et al CV-0000064-2016 May 23, 2016 Guthrie Clinic Ltd v. Ward, et al CV-0000072-2016 June 27, 2016 Guthrie Clinic Ltd v. Norton, et al CV-0000073-2016 June 27, 2016 Guthrie Clinic Ltd v. Paul, et al CV-0000074-2016 June 27, 2016 Robert Packer Hospital v. Tappan, et al CV-0000075-2016 June 27, 2016 Robin M. Hutchinson v. R. Reeves, et al CV-0000054-2016 August 30, 2016 Guthrie Clinic Ltd v. Searfoss CV-0000130-2016 October 24, 2016 Robert Packer Hospital v. Searfoss CV-0000131-2016 October 24, 2016 Robert Packer Hospital v Salsman, et al CV-0000133-2016 October 27, 2016 Guthrie Clinic Ltd v. Shepler CV-0000134-2016 October 27, 2016 Robert Packer Hospital v. Rinus, et al CV-0000135-2016 October 27, 2016
229. In those 42 cases referenced in the paragraph immediately above, Respondent Shaw did not disclose to the other party or the other party's lawyer, that Mr. DePaola represented him in a legal matter.
230. An associate attorney at Mr. DePaola's law firm, Griffin, Dawsey, DePaola &. Jones PC, represented litigants in 11 of the 42 cases filed by Mr. DePaola in Respondent Shaw's district court which were debt collection matters involving medical facilities and providers, as listed below:
*369 Case Docket No. Date Filed Arnot Ogden Medical Center v. Whipple CV-0000131-2015 August 7, 2015 Robert Packer Hospital v. Loomis CV-0000146-2015 September 4, 2015 Robert Packer Hospital v. Morley, et al CV-0000182-2015 October 29, 2015 Robert Packer Hospital v. Pardoe, et al CV-0000202-2015 December 14, 2015 Robert Packer Hospital v. Lee, et al CV-0000204-2015 December 14, 2015 Guthrie Clinic Ltd v. Shadduck CV-0000208-2015 December 17, 2015 Robert Packer Hospital v. Moore, et al CV-0000001-2016 January 13, 2016 Robert Packer Hospital v. Townsand, et al CV-0000045-2016 April 4, 2016 Robert Packer Hospital v. Saxon, et al CV-0000053-2016 April 25, 2016 Guthrie Clinic Ltd v. Searfoss CV-0000130-2016 October 24, 2016 Robert Packer Hospital v. Searfoss CV-0000131-2016 October 24, 2016
231. The associate attorney did not appear before Respondent Shaw in his district court in any of the 11 debt collection cases in which he represented a party on behalf of his law firm, Griffin, Dawsey, DePaola & Jones PC.
232. The 11 debt collection matters included various forms of communication by the associate attorney with the debtors to attempt to negotiate payment prior to filing civil complaints.
233. Mr. DePaola executed the complaints in all 11 of the debt collection matters handled by the associate attorney and his name appears on notices and correspondence in those matters.
234. In the debt collection matters handled by Mr. DePaola and his law firm's associate attorney, even if a settlement is reached, they file a civil case in district court to enforce the settlement agreement.
235. In debt collection matters that settled prior to a hearing, the associate attorney sent a letter to Respondent Shaw's district court to explain the settlement agreement.
236. In the 11 debt collection cases handled by the associate attorney, Respondent Shaw did not disclose to the other party, or the other party's lawyer that the associate attorney worked for Mr. DePaola's law firm and that Mr. DePaola represented Respondent Shaw in a legal matter.
237. In 2016, the associate attorney from Mr. DePaola's law firm, Griffin, Dawsey, DePaola & Jones PC, represented the plaintiff in each of the following three Landlord/Tenant cases filed in Respondent Shaw's district court:
a. Futures Community Support & Services, Inc. v. Dimopoulos-Spencer, Docket No. MJ-42302-LT-13-2016;
b. Futures Community Support & Services, Inc. v. Graham, Docket No. MJ-42302-LT-14-2016; and
c. Futures Community Support & Services, Inc. v. Youngs, Docket No. MJ-42302-LT-20-2016.
238. Respondent Shaw knew that the attorney who appeared before him in the three Landlord/Tenant matters set forth above was an associate attorney at Griffin, Dawsey, DePaola & Jones PC.
*370 239. At the March 28, 2016 Landlord/Tenant Hearing in Futures Community Support & Services, Inc. v. Dimopoulos, Respondent Shaw did not disclose his attorney-client relationship with Mr. DePaola to the parties or their counsel.
240. At the March 28, 2016 Landlord/Tenant Hearing in Futures Community Support & Services, Inc. v. Graham, Respondent Shaw did not disclose his attorney-client relationship with Mr. DePaola to the parties or their counsel.
241. At the May 5, 2016 Landlord/Tenant Hearing in Futures Community Support & Services, Inc. v. Youngs, Respondent Shaw did not disclose his attorney-client relationship with Mr. DePaola to the parties or their counsel.
242. In 2017, Mr. DePaola represented the plaintiff in a civil matter in Respondent Shaw's district court. Guthrie Clinic v. Teel, Docket No. MJ-42302-CV-0000005-2017.
243. On January 9, 2017, Mr. DePaola sent a letter to Respondent Shaw, asking him to file the civil complaint, Guthrie Clinic v. Teel, in his district court, serve the defendant and provide notice of the hearing date.
244. One month later, on February 8, 2017, Respondent Shaw sent a letter to Court Administration requesting his recusal from Guthrie Clinic v. Teel, and to transfer the case to another judge. Respondent Shaw did not include the reason for his request for recusal and transfer of the case.
245. On February 8, 2017, President Judge Maureen T. Beirne issued an Order appointing Judge Timothy Clark to hear the Teel matter.
246. On February 13, 2017, Respondent Shaw's district court issued a Notice of Intent to Defend form to the plaintiff pertaining to a March 13, 2017 Civil Action Hearing in Teel.
247. On March 13, 2017, Judge Timothy M. Clark entered judgment in the Teel case.
248. Between July 10, 2015, and January 2017, Mr. DePaola and his associate attorney, represented litigants in 46 cases filed in Respondent Shaw's district court.
249. Sometime between December 2016, and February 2017, Mr. DePaola notified Respondent Shaw that he must recuse from any matters filed in his district court in which Mr. DePaola, or any attorneys from his law firm, represented litigants, because of Respondent Shaw's attorney-client relationship with Mr. DePaola in this judicial disciplinary matter.
250. In February 2017, Respondent Shaw began sending letters to Court Administration, requesting to recuse himself from Guthrie v. Teel and other cases filed in his court in which Mr. DePaola, or other attorneys from his law firm, represented litigants, and to transfer those matters to another judge.
III. DISCUSSION
The most serious charge against Respondent Shaw is that he engaged in behavior which brought the judicial office into disrepute (Count Seven, Article V, § 18(d)(1) of the Constitution of Pennsylvania.) We find that Respondent Shaw did violate the Disrepute Clause by his actions described in the Joint Stipulations, particularly his actions in sending salacious text messages and engaging in sexual relations with the girlfriend of a defendant who was appearing before him in Treatment Court.
Whether a judge's improper conduct brings the judicial office (as opposed to the individual judge) into disrepute has been addressed by this Court repeatedly.
*371 As noted in In re Cicchetti, 697 A.2d 297 (Pa.Ct.Jud.Disc. 1997) :
The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed.
Many types of misconduct have been found to violate the Disrepute Clause. We have repeatedly found that ex parte contacts with a judge which could improperly favor one party in a case can amount to bringing disrepute upon the judiciary. See In re Sullivan, 135 A.3d 1164 (Pa.Ct.Jud.Disc. 2016) ; In re Roca, 151 A.3d 739 (Pa.Ct.Jud.Disc. 2016) ; In re Segal, 151 A.3d 734 (Pa.Ct.Jud.Disc. 2016).
Similarly, a judge's failure to file taxes (while judging others for tax violations) was found to have brought disrepute upon the judiciary, In re Ballentine, 121 A.3d 611 (Pa.Ct.Jud.Disc. 2015) as was the sexual touching of a minor In re Liberace, 118 A.3d 497 (Pa.Ct.Jud.Disc. 2014).
In In re Nocella, 79 A.3d 766 (Pa.Ct.Jud.Disc. 2013) a violation of the Disrepute Clause was found for the actions of a judicial candidate for repeatedly lying about his qualifications for that office. A judge who photographed his genitals and displayed that photograph to an uninterested person was found to violate the Disrepute Clause in In re Singletary, 61 A.3d 402 (Pa.Ct.Jud.Disc. 2012), as was a judge's conduct in offering two female housing court litigants favorable treatment in their eviction cases in exchange for sexual favors In re Cioppa , 51 A.3d 923 (Pa.Ct.Jud.Disc. 2012).
Here, misconduct which includes a judge engaging in secret sexual relations with the girlfriend of a defendant appearing before him whose fate is, to some degree, in that judge's hands is sufficiently shocking as to amount to a violation of the Disrepute Clause. The salacious text messages sent by Respondent Shaw also violate our ethical rules. We also find a violation in Respondent Shaw's actions and inactions regarding Mr. DiPaola, his attorney in this matter at that time, in representing parties in civil litigation before him while also representing Shaw in this disciplinary case with no notice to the opposing party.
At a minimum the opposing counsel or party in those civil cases should have been informed of that disciplinary representation. Failing to so inform is clearly wrong. Recusal would have been the most sensible course.
An assortment of other more minor charges are also included in the Amended Complaint in this case. The Complaint recites alleged misconduct involving not following the local practices of treatment court concerning communication with participants, informal texts with participants and their relatives relating to a truancy case as well as similar informality in juvenile accountability court and in the aftermath of a traffic case. It is also argued that Respondent Shaw showed favoritism to treatment court participants who had lost their licenses by giving them rides home from meetings. Because of our disposition of the more serious charges as set forth above we are not addressing the less serious charges described in this paragraph.
Unlike a criminal case in which the range of penalties is determined by the number of charges and the statutory sentence mandated for each offense upon which there is a finding of guilt, the scope of sanctions available to this Court, is not so circumscribed. Any finding by this Court that a judicial officer has violated the Constitution of Pennsylvania or the Code of Judicial Conduct subjects that *372 judge to the full range of appropriate discipline. Furthermore, in exercising our discretion in imposing a disciplinary sanction, we are guided not by the number of ways the Respondent's conduct has offended the Constitution or Code but by the nature of the conduct itself and any mitigating or aggravating circumstances. See In re Murphy , 10 A.3d 932, 937 (Pa.Ct.Jud.Disc. 2010).
In considering the conduct we find violative as set forth above we hold that such conduct violates at least parts of all seven Counts of the Amended Complaint.
IV. CONCLUSIONS OF LAW
1. Respondent Shaw has committed conduct which violates Rule 2A of the Old Rules Governing Standards of Conduct of Magisterial District Judges.
2. Respondent Shaw has committed conduct which violates Canon 1, Rule 1.2 of the New Rules Governing Standards of Conduct of Magisterial District Judges.
3. Respondent Shaw has committed conduct which violates The Special Consideration Clause of Rule 2A of the Old Rules Governing Standards of Conduct of Magisterial District Judges.
4. Respondent Shaw has committed conduct which violates Rule 8A of the Old Rules Governing the Standards of Conduct of Magisterial District Judges.
5. Respondent Shaw has committed conduct which violates Canon 2, Rule 2.11(A) of the New Rules.
6. Respondent Shaw has committed conduct which violates Article V, § 17(b) of the Constitution of Pennsylvania.
7. Respondent Shaw has committed conduct which violates Article V, § 18(d)(1) of the Constitution of Pennsylvania (Administration of Justice Clause).
8. Respondent Shaw has committed conduct which violates Article V, § 18(d)(1) of the Constitution of Pennsylvania (Disrepute Clause).
Either party may file written objections to these Conclusions of Law within ten days. In the event no such objections are filed, a date for a Sanction Hearing will be set.